OPINION
This appeal is taken by the plaintiff-appellant, John C. Bartram, administrator of the estate of Dwayne Scott Mount ("the decedent"), from the judgment of the Court of Common Pleas of Marion County granting summary judgment in favor of the defendants-appellees, Tuscarora Inc. ("Tuscarora,") et al.[1] For the following reasons, we affirm the judgment of the trial court.
The facts and procedural history of the case are as follows. On May 7, 1996, the decedent was the victim of an industrial on-the-job accident after being crushed by a hydraulic press. The accident occurred at the Tuscarora plant located in Marion, Ohio. Tuscarora produces automobile parts for Kaneka America Corporation ("Kaneka Corporation"), an automobile parts distributor. At the time of the accident, the decedent was engaged as a maintenance mechanic. The decedent, a twelve-year employee of Tuscarora, was responsible for the day-to-day maintenance and inspection of the plant's four Toyo P-2000 polyethylene molding machines, referred to as the hydraulic presses.
The hydraulic presses, owned by Kaneka Corporation, were leased to Tuscarora.[2] The presses produced styrofoam automobile bumper inserts.[3] The presses were located in Department Twenty-Eight (28) of the Tuscarora plant.
The four hydraulic presses were located side by side and were numbered one through four. Each press was mounted on an eight foot high platform, accessible by a stairway leading to a platform. Each press was fitted with six (6) safety gates. A sliding gate led to the interior of each press. Adjacent to each sliding gate was a swinging gate.
The interior of each press contained four vertical molding cavities. The molding cavities were located side by side. The styrofoam bumper inserts were produced within the molding cavities. Four bumper inserts were produced through each molding cycle[4] by a moving hydraulic press which moved from right to left. Each press exerted over seventy tons of pressure during its molding cycle.
At the completion of the molding cycle, the bumper inserts were released from the molding cavities through an opening in the bottom of the press. The bumper inserts would then fall through the opening onto a conveyor belt or "shoot". The press operator then gathered and trimmed the edges of the bumper inserts.
Each Toyo P-2000 press was fitted with two safety switches located on the top rail of the sliding gate. The switches were referred to as the "electrical limit" switch and the "air valve" or "air limit" switch. The safety switches were located at the top of the sliding gate. When the sliding gate was opened, the safety switches would shut down the press.[5] To open the gate, the press operator would pull the sliding gate to the right side. To reengage the press, the press operator had to close the gate and press the start button. The start button was located on the control panel of each press. Each press had a control panel located on the side of the press. Each press was also equipped with an emergency stop button, commonly referred to as the "e-stop" button. The e-stop button was located on the bottom of the stairway of each press.
At the time of the accident, Tuscarora had a lockout procedure requiring its press operators to completely shut down the press before performing maintenance on the press or entering the interior of the press. (See Appellee's Exhibit C). The term "lockout" means that the press is shut down and unable to be restarted until after the work on the press is finished. Locking out a press prevents a person from being injured by the press' moving parts, particularly when an individual is working within the interior of the press.
A lockout procedure is as follows. Prior to performing maintenance on the press or entering the interior of the press, the press operator would close the sliding gate and cut off the main power supply to the machine. A safety lock was then placed on the power switch to prevent the worker from being injured by the press' moving parts. In the event an employee failed to perform a lockout and the sliding gate was opened, the safety switches would shut down the press.
According to Tuscarora management, its press operators had received training in lockout procedures and were aware of the company's lockout policy. In December 1994, the decedent attended a Lockout training session. (See Appellee's Exhibit B). In October 1995, the decedent was given a written warning for failing to perform a lockout prior to entering the interior of a press. (See Appellee's Exhibit B). At the time of the decedent's accident, it is undisputed that he had entered the interior of the press without locking out the machine.[6]
The events surrounding the decedent's death are as follows. On the morning of May 7, 1996, Genevia Miller, a Tuscarora employee, arrived for her 7:00 a.m. shift. Genevia, a press operator in Department 28, was responsible for producing styrofoam automobile bumper inserts.
According to Genevia's deposition, prior to her shift she spoke with Robert Fox, the press operator from the previous shift. At that time, Fox told her that he had experienced problems with a molding cavity within the press. Fox informed her that the bumper inserts were sticking within one of the molding cavities of the press. As soon as her shift began, Genevia began to experience the same problem with press number two.[7]
The sticking bumpers had become a persistent problem, so Genevia asked the decedent to repair the press. According to Genevia, she observed the decedent climb the stairway leading to the press, which she had just previously reengaged by pressing the start button. At that point, she proceeded to press number one, collected the freshly molded bumper inserts, and trimmed the edges.
Genevia testified that, shortly thereafter, she proceeded back to press number two. At that moment, Genevia noticed blood and water running down the underside of the conveyer belt, or shoot, leading from the press. Genevia asked if the decedent had cut himself. After receiving no response, Genevia proceeded up the stairway leading to the press. Genevia discovered the decedent caught within the press. Genevia testified that the sliding gate was open and that the decedent's upper torso and head were caught between the stationary hydraulic press and the molding cavities. Genevia testified that the appellant's body was trapped between the press and the cavities, leaving a gap of only five inches.
John G. Denes, the supervisor on duty at the time of the accident, testified at his deposition that, despite the open gate, he managed to open the press by pushing the "start" button on the control panel. Darlene Rayburn, an inspector/packer, helped extricate the decedent from the press. Unfortunately, the decedent had suffered extensive head trauma and was pronounced dead upon arrival at the hospital.
On December 23, 1996, John C. Bartram, administrator of the estate of the decedent, filed a wrongful death action against Tuscarora for intentional tort. Tuscarora filed a motion for summary judgment asserting that no genuine issue of material fact remained to be litigated with respect to Tuscarora's liability for intentional tort. On May 22, 2000, the trial court granted Tuscarora's motion for summary judgment.
The appellant now appeals, asserting the following sole assignment of error.
Assignment of Error
 The trial court erred in determining that there were not material facts in dispute sufficient to deny defendant Tuscarora, Inc.'s motion for summary judgment on plaintiff's claim for wrongful death based on the commission of an employer intentional tort.
 In his sole assignment of error, the appellant maintains the trialcourt erred in granting Tuscarora's motion for summary judgment.Specifically, the appellant asserts the trial court erred in finding thatno genuine issues of material fact remain to be litigated with respect tothe claim of intentional tort. For the following reasons, we do notagree.
 Initially, we must set forth the standard of review from the grantingor denial of a motion for summary judgment. In considering an appealfrom the granting of a motion for summary judgment, we review the grantof the motion for summary judgment independently and do not givedeference to the trial court's determination. Schuch v. Rogers (1996),113 Ohio App.3d 718, 720. Accordingly, we apply the same standard for summary judgment as did the trial court. Midwest Specialties, Inc. v.Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6, 8.
Summary judgment is proper when, looking at the evidence as a whole (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party. Civ.R. 56(C); Horton v. Harwick Chemical Corp. (1995), 73 Ohio St.3d 679,686-87. To make this showing the initial burden lies with the movant to inform the trial court of the basis for the motion and identify those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. Those portions of the record include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action. Civ.R. 56(C). Once the movant has satisfied this initial burden, the burden shifts to the nonmovant to set forth specific facts, in the manner prescribed by Civ.R. 56(C), indicating that a genuine issue of material fact exists for trial. Dresher,75 Ohio St.3d at 293.
Generally, an employee's only recourse for compensation due to an injury sustained in the course of his or her employment in Ohio is the Worker's Compensation system. However, under the common law, an injured employee may seek compensation directly from the employer if the injury was the result of an intentional tort by the employer. Blankenship v.Cincinnati Milacron Chemicals, Inc. (1982), 69 Ohio St.2d 608.
In order to determine whether an employer has indeed committed an intentional tort resulting in injury to the employee, the trier of fact must apply the tripartite analysis as set forth by the Ohio Supreme Court in Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115 . The tripartite analysis states, in pertinent part, as follows:
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Id. at paragraph one of the syllabus.
The first element necessary for proof that Tuscarora committed an intentional tort is that the employer, Tuscarora, must have had knowledge of the existence of a dangerous process, procedure, instrumentality, or condition within its business operation. Thus, in order to satisfy the first prong, the appellant must establish the following: 1) there was a dangerous condition and 2) Tuscarora had knowledge that the dangerous condition existed.
In determining whether the condition or procedure was indeed dangerous, this Court has repeatedly cautioned:
 [D]angerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." Naragon v. Dayton Power Light Co. (Mar. 30, 1998), Shelby App. No. 17-97-21, unreported, citing Brady v. Safety-Kleen (1991), 61 Ohio St.3d 624 . It must be remembered that those injuries that occur in the scope of employment by definition are not intentional torts. "A workplace intentional tort is one suffered outside the scope of employment, beyond the `natural hazard[s]' of one's employment. Were it otherwise, any injury associated with inherently dangerous work" like high voltage electrical work, "could subject an employer to intentional tort liability, whatever the cause." Naragon, at 7.
In order to determine whether an employer had knowledge that such process, procedure, instrumentality, or condition was dangerous, this Court must determine the employer's actual knowledge of the dangerous condition. Fultz v. Baja Boats, Inc. (Feb. 18, 1994), Crawford App. No. 3-93-10, unreported. This Court has cautioned:
 [T]his is not the `reasonable person' standard for determining negligence or recklessness; that is, the fact that the employer should have known it was requiring the employee to work under such dangerous conditions that he would certainly be injured is not enough to establish a case in intentional tort. Rather the determination rests upon a claimant's alleging facts which show the employer's actual knowledge of the situation.
Therefore the scope of our inquiry must focus on whether the appellant has presented evidence from which it might be found that this was an injury associated with "inherently dangerous" work outside the scope of the decedent's employment. Should we conclude that the decedent was exposed to a dangerous process, procedure, instrumentality, or condition, we must further determine whether Tuscarora had knowledge that the work was dangerous.
In the case before us, the appellant contends the decedent was unduly exposed to a dangerous condition or instrumentality within the Tuscarora plant. Specifically, the appellant claims the electrical limit switch had been bypassed with safety wire, or the air valve or air limit switch had been altered, both of which had the dangerous affect of allowing the press to continue to operate in automatic cycle when the sliding gate was open.
The appellant alleges that a genuine issue of material fact remains to be litigated with respect to his claim of intentional tort because the evidence established that Tuscarora has had a history of disabling the safety switches. The appellant argues that upon viewing the inferences in a light most favorable to him, the evidence before the trial court demonstrated that when the safety features of the press were disabled, he was unduly exposed to a dangerous condition or instrumentality within the workplace.
Tuscarora, meanwhile, asserts that no genuine issue of material fact remains to be litigated with respect to the issue of intentional tort. Tuscarora argues the appellant has failed to set forth specific facts, in the manner prescribed by Civ.R. 56(C), indicating that a genuine issue of material fact exists for trial. Tuscarora maintains that the appellant has failed to set forth evidence demonstrating that the safety features on the sliding gate of press number two, specifically the electrical limit switch or the air valve or air limit switch, were disabled at the time of the decedent's accident. Tuscarora argues that, although the exact known cause of the accident may never be known, the allegations of intentional tort are entirely without merit and are wholly unsupported by the record.
Having reviewed the record herein, we find that the trial court did not err in granting summary judgment in favor of Tuscarora upon the claim of intentional tort. The record herein fails to set forth specific facts indicating that a genuine issue of material fact exists for trial. Specifically, we find the appellant has failed to set forth specific facts demonstrating that the electrical limit switch or the air valve or air limit switch of press number two was disabled at the time of the accident.
Although the appellant has set forth sufficient, specific credible facts that on numerous past occasions Tuscarora employees, including management personnel, had disabled the safety switches on the presses[8], there is no evidence indicating the safety switches of press number two were disabled on the morning of the accident. In fact, the record affirmatively establishes otherwise.
Genevia Miller, the press operator who had asked the decedent to repair the press and had witnessed the immediate aftermath of the decedent's accident, testified at her deposition that during the first half-hour of her shift she had been experiencing problems with a molding cavity within press number two. Deposition of Genevia Miller at *53. Genevia testified that the bumper inserts were becoming lodged within the fourth molding cavity.[9] See id. at *52. Genevia testified that each time a bumper insert became lodged within the press, she simply opened the gate, reached in with her hand, and removed the bumper insert.[10] See id.
Genevia testified that the press stopped each time she opened the sliding gate. See id. at *56. According to Genevia, she simply closed the sliding gate and pushed the start button to reengage the press. See id.
at 53, 56.
Marion County Deputy Sheriff Russell L. Knotts was the first investigating officer to arrive at the scene of the accident. Deposition of Russell L. Knotts at *12. Deputy Knotts was the primary investigating officer and testified at his deposition that he inspected press number two and did not observe any "wire", "tape" or "restraining mechanism" on the safety switches. See id. at *71. Deputy Knotts also testified that the safety switch was in the "down" position. See id. at 42. A safety switch in the "down" position when the sliding door was open meant that the switch was in proper working condition.
Gary Stephen Keener, the shift supervisor on duty at the time of the incident, testified at his deposition that shortly after the accident he demonstrated to Marion County deputies and the Marion County Fire Chief how the electrical limit and air valve or air limit switches functioned on the number two press. Deposition of Gary Stephen Keener at * * 75-76. According to Keener's deposition testimony, the press' switches did not appear disabled. See id.
Steven M. Homich, plant manager at the time of the incident, testified at his deposition that approximately one hour after the accident he performed a visual inspection of the press in the presence of a Marion County deputy sheriff. Homich also testified that the switches were in the "down" position. Deposition of Steven M. Homich at *135.
John G. Denes, general foremen at the time of the incident, testified at his deposition that he inspected the number two press on the afternoon of the accident. According to Denes, "the switches looked like they were in the right place." Deposition of John G. Denes at * * 52-53.
Yoshio Shiramizu, the lead designer of the Toyo P-2000 press, testified at his deposition that, in his expert opinion, the press would not have opened, thereby releasing the decedent from the press, unless one of the two following circumstances had occurred. First, the electrical limit switch or air valve or air limit switch had been disabled or, second, the decedent was holding the switches down with his hand(s) at the time he reached into the press. Deposition of Yoshio Shiramizu at * * 16, 37-38. Thus, Shiramizu's own deposition testimony establishes that he could not provide a definitive explanation for the cause of the decedent's accident. Furthermore, Shiramizu testified that because the moving hydraulic press exerted over seventy tons of pressure during the molding cycle, in the event the safety switches had been disabled at the time of the accident, the hydraulic press would have closed completely and would not have stopped after initially crushing the decedent. See id. at 133-134.
All of the foregoing evidence leads us to the conclusion that the appellant has failed to set forth specific facts indicating that a genuine issue of material fact exists for trial. Specifically, the appellant has failed to establish that a genuine issue of material fact exists for trial which demonstrates knowledge by Tuscarora of the existence of a dangerous condition or instrumentality within its business operation.
Having identified those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements(s) of the appellant's claim of intentional tort, we find that the trial court did not err in granting Tuscarora's motion for summary judgment.[11] Accordingly, the appellant's sole assignment of error is not well-taken and is overruled.
Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
WALTERS, J., concurs.
SHAW, J. Dissenting.
[1] Tuscarora, Toyo Machine Metal Co. Ltd. ("Toyo Machine Metal), and Kaneka America Corporation were named as the party defendants. Kaneka Corporation and Toyo Machine Metal eventually settled their claims against the decedent's estate.
[2] The presses were purchased by Kaneka Corporation from Toyo Machine Metal.
[3] The styrofoam bumper inserts were produced for Kaneka Corporation and shipped to Honda of America Mfg., Inc.
[4] Each molding cycle consisted of four separate and distinct molding processes.
[5] Opening the sliding gate a distance of at least two inches could stop and shut down the press.
[6] We note that Steven Alan Hunt, a maintenance worker for Tuscarora, testified in his deposition that at the time of the accident the main disconnect of press number two was disabled. Therefore, the lockout procedure could not have been followed by the press operator. However, Hunt did testify that, in the alternative, the press operator could have shut down the press by turning off the machine's main breaker. Deposition of Steven Alan Hunt at * * 52-53.
[7] Genevia had been operating Toyo P-2000 press numbers one, two, and three on the morning of the accident.
[8] According to the record, the safety switches on the presses were disabled for several reasons. First, several employees testified that the presses vibrated, causing the safety gates to open, which in turn shut down the presses. The evidence also suggests the safety switches were disabled because the steam generated from within the presses was inadvertently released through the sides and bottom of the gates, which in turn would jar open the gates causing the presses to shut down.
[9] Genevia testified at her deposition that she did not remember which molding cavity was the source of the problem.
[10] Genevia testified that, on occasion, she would press the e-stop button to stop the press. However, on the majority of occasions she simply opened the gate to stop the press.
[11] For the foregoing reasons, we need not consider the parties' remaining claims.